DowNey, Judge,
delivered the opinion of the court.
The plaintiff seeks to recover for certain alleged losses occasioned by the suspension, modification, and partial cancellation of a contract which it had on January 31, 1919, entered into with the "United States for the furnishing of 1,185 suspension crane scales at $155 per scale and includes in its claim anticipated profits of $78,408.46 on 688 of the scales as to which the contract was canceled. As presented to us this last-mentioned part of the claim constitutes the chief, practically the only, subject of material controversy.
These scales were intended for use on vessels of the Navy, particularly on destroyers, and on February 14, 1919, plaintiff was notified that due to a change recently made in the equipment of ships the 300 scales scheduled for delivery at the Boston Navy Yard would not be needed and that investigation was being made to ascertain whether those scheduled for delivery at other points were still desired, but at a conference had it was ascertained that this action was taken because the scales were unsuitable by reason of size of platform for use on destroyers and the difficulty was overcome by agreement as to reduction of size.
On February 25, 1919, plaintiff was notified that most of the scales called for by the contract would not bej needed, that investigation was being made to ascertain the exact quantity that would be needed, and was requested not to proceed with the manufacture of scales, and to notify its subcontractors accordingly, and also to advise whether it could make a reduction in the quantity without incurring damage, but plaintiff, assuming that this action; like that of February 14, was because of the size of the scales, a matter which had been adjusted, made no reply to this letter and on March 21, 1919, the plaintiff was further advised by the Bureau of Supplies and Accounts, Navy Department, that due to changes in the equipment of ships of the Navy many of the scales called for by the contract would not be needed and was informed of the respective numbers which would be needed at stated yards and stations, a total of 497.
Deliveries having been in the meantime suspended, the plaintiff on June 7, 1919, requested, for reasons stated,, authority to make shipment of the 497 scales mentioned in *38 the Bureau’s letter of March 21, 1919, stipulating that “by so doing we do not in any way prejudice ourselves on the balance of the original order which will come up on final adjustment,” and, under the same date, whether before or after the receipt of plaintiff’s letter does 'not appear, the Bureau of Supplies and Accounts issued to the plaintiff instructions for the shipment of the scales required under the contract in question stated in the letter of March 21, under items 1 to 6, but excluding any shipment to Mare Island, and the plaintiff at subsequent times delivered the 497 scales as directed and was paid therefor the contract price.
On August 18, 1919, the plaintiff was informed by letter that the requirements for scales had been taken up with all yards and stations and that “no further additions will be made to the reduced quantities as now called for under contract 45987.”
It is conceded by the defendant that there is a right of recovery on the part of the plaintiff, and the conceded amount is but comparatively little less than that claimed, $15,582.70 conceded as against $16,853.59 claimed, aside, of course, from the wholly disputed claim for anticipated profits. Upon plaintiff’s showing as to a damage in the sum of $4,966.65 by reason of directed suspension of the work and a loss of $11,886.94 on materials, etc., provided for the filling of the contract as originally made, coupled with the fact that the defendant lias not made any real attempt to controvert these figures, we have considered the claim of the plaintiff in these respects as established, and there remains for solution only the question as to the right of the plaintiff to recover its prospective profits on 688 scales which it was not permitted to deliver, alleged by it to be $78,408.46, or $113.96-f- per scale, contract price of which was $155.00.
The plaintiff’s contention is that there was a partial cancellation of the contract without right, a refusal to perform in full, and therefore a breach, and that the profits that it would have earned are recoverable as a part of its damage. The defendant predicates its defense on the proposition that *39 even though there was in terms no cancellation clause in the contract, the defendant, under the law, had a right to cancel, and, having such a right, anticipated profits are no part of the just compensation provided for in the law. The acts of March 4, 1917, 39 Stat. 1168-1192, June 15, 1917, 40 Stat. 182, and July 1, 1918, 40 Stat. 704-719 and 720, are relied upon.
The plaintiff suggests the inapplicability of the acts of March 4, 1917, and July 1, 1918, because both refer to “ existing contracts ” and because further the act of March 4, 1917, was limited in its authority to March 1, 1918, and discusses in detail the construction of the act of June 15, 1917, while the defendant, relying on the act of June 15, 1917, maintains that the other acts are properly for consideration because in pari materia and enlightening as to the legislative intent.
The act of June 15, 1917, was an act making appropriations to supply deficiencies in appropriations for the Military and Naval Establishments on account of war expenses. The provisions invoked by the defendant are found under the subhead “ Emergency shipping fund ” wherein, within the limits of the amounts authorized, the President is given certain powers with reference to placing orders for ships or material, requiring owners of plants to place their output at the disposal of the United States, requisitioning plants and ships, etc., among which is the power “(J) To modify, suspend, cancel, or requisition any existing or future contract for the building, production, or purchase of ships or material.”
Provision follows, in case of the exercise of any of these powers by the President, for the making of just compensation to be determined by the President with a right, if the compensation fixed is unsatisfactory, to receive 75 per centum thereof and to sue under section 24, paragraph 20, and section 145 of the Judicial Code for such sum as added to said 75 per centum will make up such amount as will be just compensation, followed by a further provision that—
“ The President may exercise the power and authority hereby vested in him, and expend the money herein and here *40 after appropriated through such agency or agencies as he shall determine from time to time,”
with a proviso not here material.
Following are provisions as to what shall be deemed to be included in certain words used in the act, among which it is provided that—
“ The word [1] material ’ shall include stores, supplies, and equipment for ships, and everything required for or in connection with the production thereof,”
and it is then, provided that the authority granted to the President in the act or by him delegated shall cease six months after the final treaty of peace is proclaimed between this Government and the German Empire.
On July 11, 1917, the President, by Executive order, directed that the United States Shipping Board Emergency Fleet Corporation should exercise the powers vested in him by this act in so far as applicable to the construction of vessels, the purchase or requisitioning of vessels or of contracts for their construction, and all powers applicable to the production, purchasing, and requisitioning of materials., and that the United States Shipping Board directly or in its discretion through the Emergency Fleet Corporation should exercise the powers delegated to him in so far as applicable to taking over by purchase or requisition of constructed vessels or parts thereof or charters therein and the operation, management, and disposition of such vessels and other vessels acquired by the United States.
On August 21, 1917, the President by a further Executive order directed that the Secretary of the Navy should exercise all the powers vested in him by said act “ in so far as applicable to and in furtherance of the construction of vessels for the use of the Navy and of contracts for the construction of such vessels, and the completion thereof, and all powers and authority applicable to and in furtherance of the production, purchase, and requisitioning, of materials for construction of vessels for the Navy and for war materials, equipment, and munitions required for the use of the Navy, and the more economical and expeditious delivery thereof.”
The primary question for. our consideration involves a construction of the paragraph of the act quoted above au *41 thorizing the President, through delegated agency, “ to modify, suspend, cancel, or requisition any existing or future contract for the building, production, or purchase of ships, or material ” in respect to its application, whether to private contracts alone or to Government contracts as well.
It will be readily apparent that the construction of this act in this particular respect is of far-reaching importance since it may readily be assumed that by reason of unusual governmental activities of recent years involving the making, the modifying, and the cancellation of contracts the construction here determined will be for frequent application.
There are collateral matters, other acts, debates in Congress, etc., which throw some light - on the purpose and meaning of the provision in question, and we will find it necessary to refer to them, not because it is deemed necessary to predicate a construction thereon, for in our view the language is not ambiguous; and, if not so, extraneous aids to interpretation are neither a necessary nor proper resort, but because they are cited in part in support of plaintiff’s construction of the act, whereas we regard them in their entirety as strengthening the construction we shall put upon it.
The words “ modify,” “ suspend,” “ cancel,” and “ requisition ” are each of plain, well-understood meaning and each has its proper function in the accomplishment of the intended purpose. Combined, they covered the whole field of necessary operations so far as contracts were concerned, to the end that they might be so treated as should be found necessary to the accomplishment of governmental purposes. It is required that they be given their usual accepted meaning unless it satisfactorily appears that they w.ere used in some other sense.
It is suggested that the use of the word “ requisition ” is decisive of the meaning of the provision since this word could only apply to private contracts and not to contracts with the United States, but we may not properly resort to one word as determinative of the question when four are for consideration. No doubt “ requisition ” must find its application only to private contracts, since a conception of the Government attempting to requisition its own contract must be founded upon absurdity, but with equal assurance *42 majr it not be said that Congress never intended to do such an uncalled for and wholly unjustified thing as to authorize the “ modification ” of private contracts. The power and the purpose are equally beyond conception. Contracts must possess certain elements to give them life, and arbitrary modification without consent of parties would be impairment to the extent of destruction. The essential of mutual agreement to the same thing in the same sense would be destroyed and no valid contract binding upon the parties would remain. A private contract might first be requisitioned and then modified to suit the purposes of the Government, but when thus modified it would, by virtue of the requisitioning, be the Government’s contract.
It seems appropriate in connection with these observations as to the apparently necessary application of the word “modify” to revert briefly to the facts of the case for the purpose of suggesting that although both parties refer to what was done as a “ partial cancellation ” of the contract, what was in fact done was to “ modify ” the contract by reducing the number of scales to be furnished thereunder. Counsel treat this transaction as a cancellation of the contract as to all scales called for in excess of 497, and that may, in a sense, have been the general effect, but the actual transaction, first definitely evidenced by the letter of March 21, 1919, was to inform the plaintiff that many of the scales called for by the contract would not be needed and to restate in six items the needs at various yards and stations, totaling 497, referring to the action taken as “ reductions,” and iii replying to this letter the plaintiff declined to accept any “reductions” on the contract. Finally, at a later date, the Bureau of Supplies and Accounts informed the plaintiff that no further additions would be made to the reduced quantity as now called for under contract JfS987. As thus modified by a reduction in quantity the contract was performed, and while the Government did in fact refuse to accept more than this reduced number of scales, there was, speaking strictly, no cancellation.
If under some circumstances the words “ suspend ” or “ cancel ” might imply a power which the Government was authorized to exercise in respect to private contracts, it is *43 plain that their natural application is to contracts to which the Government is a party and such application could scai’cely be excluded from the scope of the legislation in the absence of any basis for the conclusion that such exclusion was intended.
The purpose and scope of the act in its entirety are for consideration and if, in the accomplishment of its purpose it is to be conceded that the powers conferred had application in part at least to private contracts, it is significant that the limitation put upon the exercise of the powers conferred extended over a period during which there could be no possible occasion for their exercise except in connection with Government contracts.
It was provided that the authority granted should cease “ six months after a final treaty of peace is proclaimed between this Government and the German Empire.” Actual hostilities always cease some time before peace by treaty follows. The interim is usually covered by an armistice following the cessation of hostilities. Actual warfare having ceased under the terms of an armistice probably to be followed by a treaty of peace there could seem to be no reason for the further exercise of any of the granted powers so far as private contracts were concerned, since further subordination of private rights to the necessity of preparation for war was presumably unnecessary, but the very circumstance which rendered unnecessary the exercise of any of these powers as to private contracts presented reasons for their exercise as to Government contracts. Hostilities having ceased, with every prospect that the war was over, the natural thing to do would be to first “ suspend ” contracts for war supplies and later, when circumstances justified it, to “ cancel ” contracts for unneeded supplies, and if, perchance, cancellation were not justified before the final accomplishment of peace six months thereafter were provided for the exercise of that power, and it seems impossible to conceive of any use to be made of any of the granted powers during this extended period except the power of cancellation and that necessarily as to Government contracts.'
Indeed, the fact that the operation of the statute is extended to a period of six months beyond the proclamation of *44 peace shows a recognition by Congress of the fact that the conditions we have mentioned could and probably would arise and an intention to provide for them. Contracts, whether “ existing or future,” were brought within the scope of the legislation, and the power was given to modify or cancel them when there was no further need for a part or all of the things that furnished their consideration. If a party’s contract, made after the act was passed and after the war had actually ended, does not fall within the general purposes of the legislation as we have referred to it, it is still true that such a contract is within its language and terms, and we have no. right to say that the act does not apply to it.
We are cited, by reference to another case, to extracts from debates in the Senate and House during the pendency of the bill which finally became the act in question from which it is sought to draw the conclusion that the powers conferred with reference to contracts were regarded and intended by Congress as applying only to private contracts. We can not go into a detailed consideration of the lengthy debates on this and kindred legislation. Much of it is but the expression of individual opinions, widely divergent, seldom indicative of careful consideration and binding, as a theory, upon no one, but it seems to us that the history and purposes and scope of this class of legislation with such expressions as to its purpose as are proper for consideration, found not alone in the parts of the record cited but in the entire record, not only do not sustain plaintiff’s deduction but to the contrary. They evidence a purpose to grant every power to which there might be any possible occasion to resort and to err, if at all, by granting too largely rather than to take the responsibility of withholding any desired or possibly needed power.
Two of the words used in expressing the powers granted with reference to contracts are found also in the Naval Appropriation Act of March 4, 1911, subhead “ Naval emergency fund,” 89 Stat. 1192. While this legislation was pending question arose as to progress being made under the then authorized ship building program and the Secretary of the Navy sent to the chairman of the House Committee on Naval Affairs a lengthy letter (Cong. Record, vol. 54, part 3, p. *45 2584), in which he reported fully on the status of the ship building program and the difficulties encountered in expediting it, and, apparently, to assist in meeting existing conditions and, as provided, to enable the securing of more economical and expeditious delivery of materials, etc., and construction of ships, power was given the President in that bill, among other things, to “ modify ” or “ cancel ” any existing contract with power further to take possession of the factory of any contractor if he should refuse to comply with a contract as so modified, provisions which clearly, as in that act used, applied to Government contracts. The provision, however, was limited to “existing” contracts and the power granted was limited to March 1, 1918.
A comparison of the two acts renders it plainly apparent that the act of June 15, 1917, subhead “ Emergency shipping-fund,” in so far as powers conferred upon the President is concerned, was modeled after the act of March 4, 1917. There is rearrangement with some modifications, but the inclusion of the same subject matter with so much of the same phraseology could have resulted only from the use of one as a model for the other. Changes or additions therefore become significant. As passed in the Senate, the clause in the act of June 15, 1917, conferring power as to contracts ■contained the additional word “ requisition ” and it was made applicable to “ future ” as well as “ existing ” contracts. To words, therefore, plainly applicable in the naval bill to Government contracts only, and repeated in the act of June 15,1917, was added a word having particular application to private contracts. In conference there was rearrangement of Senate provisions and, as to the contract clause, the word “ suspend ” was injected, the manager on the part of the House stating during consideration of the conference report that “ It gives power to suspend contract's as well as to cancel, modify, or requisition. In the Senate provision there was no authority to suspend a contract between private parties which might[1] interfere with the Government requisitioning or requiring work to be done.” It is true that the discussion on the floor of the Plouse as to the effect of the addition of this word was addressed largely to its application to private contracts as to which there were *46 widely divergent views both as to the purpose and effect of and the power to enact such legislation, but there is nothing in the whole course of the legislation, even including the debates, justifying the conclusion that all the powers granted as to contracts were deemed applicable alone to private contracts. Bather, beginning with the original provision, used as a basis for the formulation of that in question, and considering the additions with the apparent purposes intended to be accomplished thereby, would it seem to have been the purpose to broaden powers already applicable to Government contracts and to so broaden them as to permit the exercise of any necessary power in relation to contracts of the character in question, either public or private.
It is further contended that the subject matter of this contract, viz, “ suspension crane scales,” was not within the purview of the act and that it does not appear that the President delegated his powers as to contracts to the Secretary of the Navy or that the Secretary of the Navy acted in the matter of the modification or cancellation of this contract. The act under discussion defines several words used and in that connection provides that the word “ material ” shall include “ stores, supplies, and equipment for ships.” It is found as a fact that these scales were intended for use on ships of the Navy, and it must be concluded from other facts found that the plaintiff fully understood that they were so intended. The act authorized the President to exercise the powers granted through such agency or agencies as he might determine. In so far as the provisions in question referred to the construction of vessels for the use of the Navy he delegated his powers to the Secretary of the Navy. It is entirely too narrow a construction to conclude, as contended, from a technical consideration of language used that he delegated none of his granted powers as to contracts. By the two Executive orders he delegated his powers to the Shipping Board, the Shipping Board Emergency Fleet Corporation, and the Secretary of the Navy, assigning, respectively, the functions falling naturally within their usual scope of operations, and it is not a reasonable construction to conclude that powers granted him because possibly necessary to be exercised in the furtherance of the purposes to be accomplished were with *47 held from his delegation to his selected agencies. The Executive orders were no doubt intended to cover the whole field of operation under the act, and their language justifies that construction.
It can not now be tenably contended that powers granted to the head of an executive department must be personally exercised by him. The impossibility in practice of the application of such a rule has been frequently suggested by highest authority. The bureau of the Navy Department, well known to have jurisdiction of such matters under the general direction of the Secretary, acted in this matter. It is perhaps to be observed that the act of April 22, 1918, 40 Stat. 535, amending the act of June 15, 1917, authorized the President to exercise his powers “through the several departments of the Government ” as well as through “ such agency or agencies as he shall determine from time to time.”
It is scarcely of value to discuss the question as to whether this contract in its subject matter was of the type of contract in contemplation when this legislation was enacted or whether these scales at the time the contract was made were in any sense to be regarded as war material. If the provision of this act with reference to the modification,' •cancellation, etc., of contracts, applied to Government contracts, as we believe and hold that it did, it was a provision of existing law which must be read into the contract and the contract is to be treated, in determining the rights of the parties thereunder, as if modification and cancellation clauses were written therein. To so consider it is not to depart from frequent practice, for it is common in Government contracts to find provisions for changes, additions, or subtractions, usually upon terms provided as to compensation, increased or diminished, and it is not unusual to find provision for cancellation.
The act in question provided for compensation in case the Government should exercise powers conferred as to canceling, modifying, suspending, or requisitioning contracts, taking over plants, etc., and the measure is “just” compensation. Having the right, as we conclude, to modify the contract by reducing the number of scales called for or to cancel it as to all over a given number, however the procedure *48 may be regarded, though treated by the parties in their briefs as a partial cancellation, what is required by “just compensation ” ? The 497 scales made and delivered under this contract were paid for at the contract price. Five hundred and seventy-five were actually delivered and paid for at this price, but a part were on another order. By our conclusion of law based on Finding VII we allow the plaintiff $10,888.06 on account of materials procured for and necessary to the full performance of this contract, which is all that is claimed on this account. This amount represents $11,774.40 worth of materials, with a salvage value of $886.34 deducted. It is difficult to comprehend how materials of this class, costing $11,774.40, could have a salvage value of only $886.34, even on falling prices, but such is the showing made by plaintiff, the defendant submitting no testimony on the question. We have also, based on the same finding, allowed $998.88 on account of special tools alleged to have been required for the making of these scales. This is upon plaintiff’s showing made that, tools costing $2,024.62 were worth but $104 after this contract was terminated and $998.88 of the depreciation is apportioned to the unperformed part of this contract. We have by our conclusion of law based on Finding IV allowed the plaintiff $4,966.65, covering its own estimate as to the proportion of “ general administration and overhead expenses ” chargeable to this contract by reason of suspension of the work for a period of approximately two and a half months. It is safe, therefore, to say that every element of actual damage sustained by the plaintiff by reason of the modification, or, as it is called, cancellation, of this contract is covered by these awards and to the full amount claimed. It appears further that, having by these awards been fully compensated for every dollar of actual damage claimed, the plaintiff received a profit of $114.91+ on every one of these scales on a production cost, including labor, material, and overhead, of $40.08+ per scale, a profit of more' than 286 per cent. Plaintiff, on the basis of this showing as to the cost of production and resultant profits, asks judgment for the additional sum of $78,408.46 as anticipated profits on *49 the 688 scales which it was not permitted to deliver under the contract. It is interesting to note the percentage of profit accruing to plaintiff on the whole number of scales called for by the contract, assuming an apportionment thereto of the profit actually received on 497.
Before coming to the strictly legal phase of the question we may perhaps be justified in considering briefly the suggestion made that the fact that the profit was quite large is beside the question, in connection with which it is suggested that the contract was awarded after competitive bidding and that “ It may well be that there were circumstances, such as great personal or technical skill, which would show that the seemingly large profits involved were really quite nominal and not at all disproportionate to the service involved.”
It is to be noted that there is no contention that such a startling proposition as that these “ seemingly large profits ” were really “ quite nominal ” is demonstrated or even attempted to be demonstrated by the record. It in fact appears from the record that practically all parts entering into the construction of these scales were procured on the outside and that plaintiff’s plant was but little more, if anything, than an assembling plant, and the fact that these scales were different from any customarily made by the plaintiff and required the purchasing of special tools with which its plant was not then equipped is inconsistent with the idea that the Government in consideration of such abnormal profits acquired anything out of the ordinary by way of plant facilities or technical skill.
That this contract, demonstrating such an abnormal profit, was the result of competitive bidding, could but give rise to question as to the methods and motives of all bidders were there no other possible explanation. We may only surmise, since nothing appears of record on the subject, but, desiring to avoid the impugning of any bad motives, the only reasonable justification otherwise that we can find for the submission of bids upon such an extravagent profit basis is to be found in the assumption that bidders knew that they were assuming the hazard of a cancellation or curtailment of the contract at any time.
*50 The compensation required by the act is “ just ” compensation. And if the law, read into the contract, gave the Government a right to modify or cancel, requiring only just compensation, the compensation required must necessarily have reference to conditions resultant from the exercise of a right and not involving a breach of contract.
The plaintiff was paid for all scales it was permitted to furnish and has its profit thereon and we have awarded it judgment to the full amount of its claim for all actual damages alleged to have been suffered by the cancellation of the contract. Is it required that anticipated profit on the unperformed part of the contract should be added? Are they a necessary part of “ just compensation ” for the exercise of a right to cancel? We think not.
Considering the existent situation if the right-to modify or cancel, as expressed in the statute, had been actually written into the. contract, and it was for construction, it is doubtful if such a contention would ever be seriously made. If it should be said that the contract gave the contractor the right to perform the entire contract with resultant profit the answer would be that the contract, necessarily with the consent of the contractor, gave the Government the right to terminate it at any desired stage during its performance, as a result of which any further rights thereunder, with resultant advantage to the contractor by way of profits, ceased. At that point, as by a distinct line of demarcation, the future is separated from the past and adjustment of rights on the basis of just compensation to the contractor has its proper field of operation behind and not beyond that line.
The particular act under discussion does not attempt to define the scope of “just compensation,” but in one important act we find an expression of the legislative mind as to the basis of compensation under circumstances some of which are analogous to those with which we are dealing. The Dent Act, 40 Stat. 1272, contemplates adjustment of contracts not formally executed on a “ fair and equitable basis,” not materially different from a basis of “just compensation,” when there has been performance “ in whole *51 or in part ” or “ expenditures have been made or obligations incurred upon the faith of the same,” and it is provided—
“ That in no case shall any award, either by the Secretary of War or the Court of Claims, include prospective or possible profits on any part of the contract beyond the goods and supplies delivered to and accepted by the United States and a reasonable remuneration for expenditures and obligations or liabilities incurred in performing or preparing to perform said contract or order.”
This is, of course, not a Dent Act case, and we are not unmindful of the difference in the status of parties with or without properly executed contracts, but the purpose of that act was to relieve those complying or having prepared to comply with Government orders or informal contracts from the disabilities growing out of the fact that they were not then in possession of formally executed contracts and it authorized adjustment with them on a designated basis which to Congress seemed “ fair and equitable.”
The question here decided was presented in College Point Boat Corporation v. United States, decided April 4, 1921,1 and it is now said that, although there presented by the defendant, we rendered judgment for the plaintiff “without dignifying the point by discussing it.” Under the facts of that case vre found it possible to determine the rights of the parties as we saw them without considering or deciding this question, and as to it we can not consent to be committed by that case.
We are of the opinion that our judgment awards the plaintiff just compensation and that it is not entitled to have included therein the prospective profits claimed.
Judgment for plaintiff under Findings IV and YII in the sum of $16,853.59, and the petition is otherwise dismissed.
Hat, Judge; Booth, Judge, and Campbell, Chief Justice, concur in the foregoing opinion.

 In tile College Point Boat Corporation case the court on Jan. 16, 1922, filed an order setting aside its former judgment, withdrawing the findings of fact, and remanding the case to the calendar for further proceedings.