DowNey, Judge,
delivered the opinion of the court.
The plaintiff’s action is for the recovery of damages by reason of the cancellation of a contract for 250 antiaircraft gun mounts with sights, which was entered into between it *478 and the United States on the 14th of May, 1918, the United States being represented in the execution of said contract by the then Acting Secretary of the Navy. This contract took the number 1498 and will be so referred to.
During the progress of the war representatives of the United States were seeking manufacturers competent to undertake the class of work involved in this and a previous contract, and were recommended by the president of a concern then engaged for the United States in that line of work to the Russell Motor Car Company (Ltd.), a Canadian corporation, which was then engaged in the manufacture of munitions for the British Government. It followed that the Canadian corporation took up the matter with representatives of the United States and was requested to submit a bid, which it did, and which in competition was found acceptable.
The fact that the bidder was a Canadian corporation caused some discussion, as a result of which it concluded to incorporate and acquire a plant in the United States for the purpose of the performance of the contract then in contemplation. It did incorporate in the United States under the laws of the State of Delaware, the Canadian corporation subscribing for a considerable proportion of its capital stock, and procured and equipped a plant at Buffalo, N. Y. It transferred from its Canadian plant sufficient men experienced in munitions manufacture to form the nucleus of an organization, and by reason of the former experience of these men the plaintiff’s organization in the United States was, no doubt, an efficient one at an earlier date than it could otherwise have been. We have found the facts with reference to this feature of the matter and mention them because we are requested to find them by the plaintiff and because upon them the plaintiff lays much stress in the presentation of its case; but we are of the opinion that they are wholly immaterial so far as the merits of the case are concerned. The contract then in contemplation was not the contract here involved but was a previous contract entered into on the 3d day of November, 1917, for the manufacture of 400 antiaircraft gun mounts and sights.
But aside from that feature of the matter it might reasonably be assumed that steps taken by the plaintiff toward *479 the perfecting of an efficient organization were for its own benefit and that it incorporated in the United States and acquired its factory for the performance of said contract, not from any compulsion, or, so far as appears, from any patriotic motives inuring to the United States, but because it regarded it as advantageous from the standpoint of its own interest. It might be added that even though it does appear that the performance of this first contract was satisfactory as far as the character of the output was concerned, the plaintiff company was not able to perform it within the time required by the contract but was the recipient of a very substantial extension ox time.
Soon after the incorporation of the plaintiff company it. as suggested, entered into a contract with the United States for the manufacture of 400 antiaircraft gun mounts with sights at a contract price of $8,462.00 each, deliveries to commence on or before May 15, 1918, and, following in stated numbers each month, to be completed on or before January 15, 1919.
The 250 gun mounts provided for by contract 1498, executed May 14, 1918, were to be of the same kind, character, and quality as those provided for in contract 949, but at the lesser price of $7,860.00 each, the deliveries under said second contract numbered 1498 to commence on or before October 31, 1918, and be completed by monthly deliveries on or before April 30, 1919. The first delivery, therefore, under conti’act numbered 949 was due on or before the day following the execution of contract numbered 1498.
It becomes important now to note in connection with scheduled deliveries and as bearing upon some questions presented and discussed by plaintiff that upon the 19th of September, 1918, the plaintiff, then being obligated under both contracts, each with its separate schedule of deliveries, requested, in writing, a modification of the schedule of deliveries, submitting a requested schedule to cover all deliveries under both contracts, but with the stipulation that it should be permitted to apply all shipments of mounts on the first contract until the same was completed, and thereafter to follow with shipments upon the second contract. *480 This schedule of deliveries, found in Finding IX, contemplated the delivery of 5 mounts in June, 20 in July, and 40 in August, the three months preceding the requested change; 50 in September, the month in which .the request for the change was preferred, and a completion of deliveries on both contracts in May, 1919. This amended schedule therefore delayed proposed early deliveries and extended the time for the completion of both contracts. The request of the plaintiff in this respect was granted by the Bureau of Ordnance, Navy Department, having charge of the matter, but it is to be remembered, in so far as this change affects any question for consideration herein, that it was solicited by the plaintiff and consented to by the defendant.
On November 23, 1918, the Acting Chief of the Bureau of Ordnance, Navy Department, informed the plaintiff that the Secretary of the Navy had authorized the cancellation of contract 1498 and directed the plaintiff to cease all work in connection therewith not later than December 2, 1918. It is proper to be noted in this connection that at this time there had been no deliveries .under contract 1498 and that contract 949, upon "which all mounts were being delivered in accordance with plaintiff’s request was not completed' for several months thereafter.
The plaintiff contends that the cancellation of contract 1498 was wholly unauthorized and that' it is therefore entitled to recover all damages resulting from said cancellation, in which it specifically includes a claim for the profits to be anticipated from the performance .of said contract predicated upon the difference between what it alleges would have been the cost to it of the 250 gun mounts and the contract price. The defendant, contends that the cancellation of the contract was authorized under the act of June 15,1917, 40 Stat. 182, and that while the plaintiff under the provisions of said act is entitled to just compensation by reason of the exercised right of cancellation by the United States, it is not entitled to recover anticipated profits as a part thereof.
The act of Juné 15. 1917, was an act making appropriations to supply deficiencies in appropriations for the *481 military and. naval establishments on account of war expenses. The provisions invoked by the defendant are found under the subhead, “Emergency shipping fund,” wherein, within the limits of the amounts authorized, the President is given certain powers with reference to placing orders for ships or material, requiring owners of plants to place their output at the disposal of the United States, requisitioning plants and ships, etc., among which is the power “(5) To modify, suspend, cancel, or requisition any existing or future contract for the building, production, or purchase of ships or material.”
Provision follows, in case of the exercise of any of these powers by the President, for the making of just compensation to be determined by the President with a right, if the compensatioh fixed is unsatisfactory, to receive 75 per centum thereof and to sue under section 24, paragraph 20, and section 145 of the Judicial Code for such sum as added to said 75 per centum will make up such amount as will be just compensation, followed by a further provision that—
“ The President may exercise the power and authority hereby vested in him, and expend the money herein and hereafter appropriated through such agency' or agencies as he shall determine from time to time,” with a proviso riot here material. -
Following are provisions as to what shall be deemed to be included in certain words used in the act, among which it is provided that—
“The word ‘material’ shall include stores, supplies, and equipment for ships, and everything required for or in connection with the production thereof,”
and it is then provided that the authority granted to the President in the act or by him delegated shall cease six months after the final treaty of peace is proclaimed between this Government and the German Empire.
On July 11, 1917, the President by executive order directed that the United States Shipping Board Emergency Fleet Corporation and the Shipping Board directly, or, in its discretion, through the Fleet Corporation, should exercise certain of the powers delegated to him by said act and by a further executive order of date August 21, 1917, he *482 directed that the Secretary of the Navy should exercise all the powers vested in him by said act “ in so far as applicable to and in furtherance of the construction of vessels for the use of the Navy and of contracts for the construction of such vessels, and the completion thereof, and all powers and authority applicable to and in furtherance of the production, purchase, and requisitioning of materials for construction of vessels for the Navy and for war materials, equipment, and munitions required for the use of the Navy, and the more economical and expeditious delivery thereof.”
The Secretary of the Navy having directed the cancellation of the contract in question and prolonged negotiation looking to a settlement of the question of compensation having failed of their purpose and this suit having been instituted, an award was made in the sum of $444,847.68 as “just compensation,” as required by said act, and the plaintiff declining to accept said award in full of its claim, it was paid a sum which, with sums already paid, amounted to 75% of the award, all upon the theory on the part of the United States that the provisions above referred to of the act of June 15, 1917, were applicable, and in awarding “ just compensation ” prospective profits were excluded. The applicability of said act is disputed by the plaintiff and in its behalf it is contended that the power “to modify, suspend, cancel, or requisition any existing or future contracts for the building, production, or purchase of ships or materials” applied only to private contracts, and this contention requires at our hands a construction of the quoted provisions in respect to its application, whether to private contracts alone or to Government contracts as well.
We have already had before us and passed upon the same question in Meyer Scale & Hardware Co. v. United States, ante, p. 26. The conclusion of this court in that case was permitted to go unchallenged. But the fact that the same question is again raised, together with the reasonable assumption, aside from what we must know from our own docket, that it will be frequently involved by reason of wartime activities in the making, modifying, and canceling of contracts, renders the conclusion of far-reaching importance.
*483 In the Meyer Scale case the question was elaborately and ably argued, much more in detail than is attempted in the instant case, and in our opinion we gave careful consideration to all phases of it, arriving at what we regarded as the only tenable conclusion and, under the circumstances, rather than content ourselves, on the one hand with a mere reference to that case, or on the other hand, attempting an independent discussion, we will restate here, with appropriate modification, the main features of our discussion of the question in the former case.
When language is not ambiguous extraneous aids to interpretation are neither necessary nor proper, but there are collateral matters, other acts, statements accompanying reports to Congress, debates, etc., which, because in a measure reverted to by counsel, we will refer to not because in our opinion they are a necessary resort, but because being cited in part by plaintiff we regard them in their entirety as strengthening our interpretation.
The words “ modify,” “ suspend,” “ cancel ” and “ requisition” are each of plain, well-understood meaning and each has its proper function in the accomplishment of the purpose intended by the act. Combined, they cover the whole field of necessary operations so far as contracts were concerned, to the end that they might be so treated as should be found necessary to the accomplishment of governmental purposes. It is required that they be given their usual accepted meaning unless it satisfactorily appears that they were used in some other sense.
It was contended in the former case and may be again argued that the use of the word “requisition” is decisive of the meaning of the provision since this word could only apply to private contracts and not to contracts with the United States, but we may not properly resort to one word as determinative of the question when four are for consideration. No doubt “ requisition ” must find its application only to private contracts, since a conception of the Government attempting to requisition its own contract must be founded upon absurdity, but with equal assurance may it not be said that Congress never intended to do such an uncalled for and wholly unjustified thing as to authorize the “modification ” of private contracts. The power and the purpose are *484 equally beyond conception. Contracts must possess certain elements to give them life, and arbitrary modification without consent of parties would be impairment to the extent of destruction. The essential of mutual agreement to the same thing in the same sense would be destroyed and no valid contract binding upon the parties would remain. A private contract might first be requisitioned and then modified to suit the purposes of the Government, but when thus modified it would, by virtue of the requisitioning, be the Government’s contract.
If under some circumstances the words “ suspend ” or “ cancel ” might imply a power which the Government was authorized to exercise in respect to private contracts, it is plain that their natural application is to contracts to which the Government is a party and such application could scarcely be excluded from the scope of the legislation in the absence of any basis for the conclusion that such exclusion was intended.
The purpose and scope of the act in its entirety are for consideration and if, in the accomplishment of its purpose it is to be conceded that the powers conferred had application in part at least to private contracts, it is significant that the limitation put upon the exercise of the powers conferred extended over a period during which there could be no possible occasion for their exercise except in connection with Government contracts.
It was provided that the authority granted should cease “ six months after a final treaty of peace is proclaimed between this-Government and the German Empire.” Actual hostilities always cease some time before peace by treaty follows. The interim is usually covered by an armistice following the cessation of hostilities. Actual warfare having ceased under the terms of an armistice probably to be followed by a treaty of peace there could seem to be no reason for the further exercise of any of the granted powers so far as private contracts were concerned, since further subordination of private rights to the necessity of preparation for war was presumably unnecessary, but the very circumstance which rendered unnecessary the exercise of any of these powers as to private contracts presented reasons for their exercise as to *485 Government contracts. Hostilities having ceased, with every prospect that the war was over, the natural thing to do would be to ñrst “suspend” contracts for war supplies and later, when circumstances justified it, to “ cancel ” contracts for unneeded supplies, or, if circumstances justified, to cancel at once, and if, perchance, cancellation were not justified before the final accomplishment of peace six months thereafter were provided for the exercise of that power, and it seems impossible to conceive of any use to be made of any of the granted powers during this extended period except the power of cancellation and that necessarily as to Government contracts.
Indeed, the fact that the operation of the statute is extended to a period of six months beyond the proclamation of peace shows a recognition by Congress of the fact that the conditions we have mentioned could and possibly would arise and an intention to provide for them. Contracts, whether “ existing or future,” were brought within the scope of the legislation, and the power was given to modify or cancel them when there was no further need for a part or all of the things that furnished their consideration.
We are cited to the Congressional Record as sustaining plaintiff’s theory that the language in question applied only to private contracts and we are particularly referred to a statement by the chairman of the Appropriations Committee on the floor of the House in which he is quoted as saying that “ There certainly could not be any taking over by the Government of its own contract. Such a statement would be impossible of performance.” We have already herein ventured to express the same opinion and that too without feeling that we were possessed of great erudition in doing so, and we need not repeat. Nor need we go into a detailed consideration of the lengthy debates on this and kindred legislation. Much of it is but the expression of individual opinions, widely divergent, seldom indicative of careful consideration and binding, as a theory, upon no one, but it seems to us that the history and purposes and scope of this class of legislation with such expressions as to its purpose as are proper for consideration, found not alone in the parts of the record cited but in the entire record, not only do not *486 sustain plaintiff’s deduction but to the contrary. They evidence a purpose to grant every power to which there might be any possible occasion to r.esort.and to err, if at all, by granting too largely rather: than to. take the responsibility of withholding any. desired or possibly needed power.
While the act of June 15, 1917 is the act here under consideration and the only act relied upon, its construction and purpose is made additionally manifest by reference to the naval appropriation act of March 4, 1917, subhead “Naval emergency fund,” 39 Stat. 1192. The process of evolution is significant. Two of the four words used in expressing powers granted with reference to contracts are found also in the latter act.
While this legislation was pending question arose as to progress being made under the then authorized ship building program and the Secretary of the Navy sent to the chairman of the House Committee on Naval Affairs a lengthy letter (Cong. Record, vol. 54, pt. 3, p. 2584), in which he reported fully on the status of the ship building program and the difficulties encountered in expediting it, and, apparently, to assist in meeting existing conditions and, as provided, to enable the securing of more economical and expeditious delivery of materials, etc., and construction of ships, power was given the President, in that bill, among other things, to “ modify ” or “ cancel ” any existing contract with power further to take possession of the factory of any contractor if he should refuse to comply with a contract as so modified, provisions which clearly, as in that act used, applied to Government contracts. The provision, however, Avas limited to “ existing ” contracts and the power granted Avas limited to March 1, 1918.
A comparison of the two acts renders it plainly apparent that the act of June 15, 1917, subhead “ Emergency shipping fund,” in so far as powers conferred upon the President is concerned, was modeled after the act of March 4, 1917. There is rearrangement with some modifications but the inclusion of the same subject matter with so much of the same phraseology could have resulted only from the use of one as a model for the other. Changes or additions therefore become significant. As passed in the Senate, the clause *487 in the act of June 15,1917, conferring power as to contracts contained the additional word “requisition” and it was made applicable to “ future ” as well as “ existing ” contracts. To words, therefore, plainly applicable in the naval bill to Government contracts only, and repeated in the act of June 15, 1917, was added a word having particular application to private contracts. In conference there was rearrangement of Senate provisions and, as to the contract clause, the word “ suspend ” was injected, the manager on the part of the House stating during consideration of the conference report that, “ it gives power to suspend contracts as well as to cancel, modify, or requisition. In the Senate provision there was no authority to suspend a contract between private parties which might interfere with the Government requisitioning or requiring work to be done.” It is trae that the discussion on the floor of the House as to the effect of the addition of this word was addressed largely to its application to private contracts as to which there were widely divergent views both as to the purpose and effect of and the power to enact such legislation, but there is nothing in the whole course of the legislation, even including the debates, justifying the conclusion that all the powers granted as to contracts were deemed applicable alone to private contracts. Rather, beginning with the original provision, used as a basis for the formulation of that in question, and considering the additions with the apparent purposes intended to be accomplished thereby, would it seem to have been the purpose to broaden powers already applicable to Government contracts and to so broaden them as to permit the exercise of any necessary power in relation to contracts of the character in question, either public or private.
It is not questioned that the subject matter of contract 1498 Avas within the purview of the act in question, that the power of the President in relation to such a contract was duly delegated to the Secretary of the NaA7y and that it was exercised by his direction through the proper administrative bureau of the Navy Department. If the provision of this act with reference to the modification, cancellation, etc., of contracts, applied to Government contracts, as we believe and hold that it did, it was a provision of *488 existing law which must be read into the contract and the contract is to be treated, in determining the rights of the parties thereunder, as if a cancellation clause was written therein.
The act in question provides for compensation in case the Government shall exercise the power conferred as to canceling, modifying, suspending, or requisitioning contracts, taking over plants, etc., and the measure is just compensation. Having the right, as we conclude, to cancel the contract, what is required to measure fully up to just compensation? Our theory necessarily excludes the idea of an award of damages as for a breach of the contract and substitutes therefor an award, pursuant to the statute, in compensation to the plaintiff for the exercise of a right accruing under the law and necessarily read into the contract requiring the treating of the contract as if a cancellation clause were written therein with a counter obligation to do justice by way of compensation in the event of the exercise of that right. In this view the authorities relied upon by the plaintiff are in large measure inapplicable.
The question of just compensation is, of course, before us de novo and not by way of confirmation or otherwise of the award made but the case is so presented upon the record, the discussion and such evidence as there is so addressed to the items of the award as made, that the finding must necessarily be largely upon that basis. And since our finding as to just compensation is the finding of an ultimate fact, unassailable unless the legal theory upon which it is .predicated is erroneous, it seems not worth while to enter into a detailed discussion of the items involved, indicated in a general way in the findings, a perhaps unnecessary detail. Some general observations may, however, not be inappropriate, particularly in view of the trend of the discussion in some respects.
It is to be remembered that the preliminary .work on the part of the plaintiff by reason of organization, acquisition, and equipping of plant, etc., was all in anticipation, so far as appears from the record, of the performance of the first contract number 949, for 400 gun mounts and sights and that contract 1498 was not then in contemplation; that engi *489 neering, designing, and drafting and other work preliminary to and in preparation for manufacture of mounts were necessary in preparation for the performance of contract 949; that contract 949 was fully performed and the plaintiff was paid the full contract price for the 400 mounts, including, according to plaintiff’s own showing, a very high percentage of profits and a release from any liability on account of delay in performance under the liquidated damage clause of the contract; that such new machinery as was afterward installed for the purpose of the performance of the contract 1498 was reimbursed for by an item included in the departmental award and in the finding herein made as to just compensation. It is also, as bearing particularly on two points argued by the plaintiff as to which, as shown in Finding XYI, there is an exclusion in the determination of just compensation, to be remembered that the change in the scheduled deliveries and the arrangement for the application of all mounts manufactured first upon contract 949 was at the solicitation of the plaintiff.
It is apparent from the record that there were prolonged negotiations for the purpose of arranging a settlement as between the plaintiff and the department. The proffers upon the part of the department were apparent^ unacceptable to the plaintiff and yet it must be said from the record that there was an apparent disposition upon the part of the department to treat liberally with the plaintiff to the end that there might be an adjustment of proper claims by reason of the cancellation of the contract 1498. The negotiations, offers, and counter contentions seem to justify the assumption that since the department was declining to consider anticipated profits as proper for allowance it was disposed to deal liberally with the plaintiff in other respects. We suggest this because there were items included in the determination of the department as to just compensation which were but scantily, if at all, supported by any facts appearing in the record and because while in some instances the plaintiff contended that the allowance was insufficient it has failed by any proof beyond mere general statements to establish either the insufficiency or the proper allowance in lieu of that tendered.
*490 The department in its first detailed determination of just compensation found the proper amount to be $497,380.01 which, upon a rechecking, it reduced to $495,250.34, and significant of the attempts on the part of the department to arrive at an award acceptable to the plaintiff is the fact that having theretofore arrived at a lesser amount it appears that there was remaining a controversy as to certain items and that in furtherance of an attempt to reach a satisfactory conclusion the department incorporated in its itemization going to make up the amounts above stated an additional item of something over $27,000.00 which it determined to be one-half of the amount apparently remaining in dispute. But the department continued to refuse to include anticipated profits upon the performance of the contract although its itemized determination did include some elements of profit and the plaintiff saw fit to reject the offer and institute this suit.
After the institution of the suit it is to be noted that the department then made a formal award of just compensation accompanied by an itemized statement, set out in Finding XII, in which it reduced the amount from that stated above to '$444,847.68. But it is proper for observation in connection with this final award which involved this much of reduction from that formerly tendered that the record fails to show the reasons for this very considerable reduction in the amount which it had theretofore concluded was properly payable to the plaintiff as just compensation. We have fixed just compensation at the amount determined upon and tendered by the department next before the commencement of this suit, and even though in some respects it seems to savor of undue liberality, it must be regarded as having been determined upon in those respects by the department in the light of detailed information which to some extent is not furnished us by the record. An illustrative point as to the basis of plaintiff’s objections, aside from the question of anticipated profits, is found in its objection made to the item with reference to raw materials taken at cost, with an additional ten per cent to cover expense of inspecting, handling, storing, etc.
*491 This ten per cent allowance the plaintiff maintains was insufficient to cover the expenses incurred in connection with the handling, inspecting, storing, etc., of the raAv materials, but its contention in that respect is, in general terms, without, so far as we are able to ascertain, any attempt to inform the court as to what the proper reimbursable expenses in that connection were. But without going into details as to the items either as to the basis upon which they were fixed or as to plaintiff’s objections thereto, or as to the possible omission of some item which should have been included, although we are not cited to any such, it is to be observed that there is in that allowance a general item of $45,000.00 denominated a cancellation allowance and to cover any items not specifically included. There is nothing in the record to justify any conclusion otherwise than that this amount additional to the specific items was amply sufficient to cover any possible contingency not included therein.
There are certain items suggested by the plaintiff as proper for consideration and allowance which are not included in our finding as to just compensation and, that the plaintiff may have the benefit of such contention as it sees fit to make with reference to those items, we have specifically set out their noninclusion in Finding XYI. The plaintiff’s contention as to the first of said items is that after the cancellation of contract 1498 the plaintiff was still required to complete contract 949 and while manufacturing the mounts and sights for the completion of that contract it could not dispose of its buildings, plant, or machinery or disband its organization and was damaged thereby.
The statement of the proposition would seem to carry its own answer. Assuredly so if the facts as found are borne in mind. The cancellation of contract 1498 had nothing whatever to do with the fact that the plaintiff was then required to continue the operation of its plant in order to complete its contract 949. The possibility might be suggested of a claim arising by reason of the cancellation of contract 1498 if that contract and the preceding contract were running simultaneously so that the cancellation of one contract imposed an additional burden, as to overhead for example, *492 upon the other contract. But tbe fact that the contracts were not being simultaneously performed, that contract 949 was not completed, and that notwithstanding' the fact that all mounts made during this period were being delivered on contract 949 instead of apportioned to two contracts, the completion of contract 949 was yet delayed for several months, precludes the idea that any expense attendant upon the performance of contract 949 was due to or in any manner aggravated by the cancellation of contract 1498.
This and other questions presented by plaintiff are in some instances discussed as if the change in the original schedule of deliveries, separate as to each contract, and the application of all amounts upon contract 949 until its completion was a burden imposed upon the plaintiff by the United States, whereas the fact is as found and heretofore suggested that that change was solicited by the plaintiff and if it was in any manner disadvantageous — which, however, does not appear— the burden can not, therefore, under any circumstances be shifted to the defendant.
The next contention, as to which some things already said appertain, is as to the profits upon 25 mounts, 10 in October and 15 in November, delivered on contract 949 which, but for the change in the scheduled deliveries, might have been delivered on contract 1498 and which it is contended that the plaintiff is entitled to recover under contract 1498. The basis of such a contention is beyond our comprehension. It is proven that if the change in scheduled deliveries had not been made and permission had not been granted to apply all mounts on contract 949 until completed that these 10 mounts in October and 15 in November would have been delivered on contract 1498.
But in addition to the suggestion as to the responsibility of the plaintiff for the change in scheduled deliveries it is for consideration that all mounts manufactured during those months were delivered to the United States and that the plaintiff received upon said 25 mounts delivered under contract 949 a price in excess of that which it would have received had they been delivered upon contract 1498. The theory may possibly be that it would have had the benefit of these deliveries on contract 1498 and still have been per *493 mitted to complete contract 949, thus accomplishing an additional delivery of 25 mounts, but facts already stated answer the contention. The third contention., excluded as shown in said Finding XVI, is based upon the cost of maintaining an office at Buffalo, N. Y., during 1920 and 1921 for the closing of its affairs. The claim-is so apparently without foundation as an element of compensation growing out of the cancellation of contract 1498 that we do not deem it necessary to discuss it.
The amounts determined upon and found fully measure the plaintiff’s rights as to just compensation under our interpretation of those rights, but because of the plaintiff’s claim therefor and request we have made a finding as to its profits to be anticipated from the performance of the contract measured by the difference between cost of production and contract price.
In this finding (XV) we have found the profits to be anticipated upon the basis of its own request supported by its own evidence which, while not without its inconsistencies and questionable accuracy, is the best available for the purpose. It show's the very handsome profit inhering in the contract and necessarily reflects how more than substantially the plaintiff must have profited under contract 949, for, while cost of manufacture may have been and probably was greater in the earlier stages of that contract, the contract price was higher by $602'.00 per mount or $240,800.00 on 400 mounts, and since the claimed ver}' large profit to be anticipated at the lesser price under 1498 is based upon cost of production in the latter stages of the performance of contract 949, there would seem to be no occasion for apprehension that the plaintiff’s venture into the field of war-time production in the United States shall have been unprofitable if, to the liberal finding awarded it herein, we shall be unable, because of our view of the law and the rights of the United States thereunder, to award it a further meed of profit for -which it has performed no service in the earning.
Reverting to the finding on the subject, made as stated, it is to be observed that the amounts as stated are on the basis of a performance of the contract by the plaintiff for which it would be entitled to receive the contract price, the *494 transaction in that event involving the assuming by the plaintiff of all the burdens of performance in return for its profits not otherwise, augmented. But if perchance the plaintiff should be entitled to recover on account of profits in addition to the amount found by us as just compensation it is apparent that the amount must be reduced by reason of the inclusion in that compensation as found of some elements of profits, some burdens to be otherwise assumed by the plaintiff in the performance of the contract, and contingent allowances not otherwise proper for inclusion, and on this basis is finally found the amount properly to be awarded if the plaintiff should be so entitled.
In that connection it is further to be noted that plaintiff in its petition claims on account of the difference between alleged cost of production and contract price, referred to commonly as anticipated profits, the sum of $954,232.50 and for other items set up in the following paragraph of its petition the sum of $367,225.30. Since we conclude that there can be no recovery on account of anticipated profits it might be said, technically, that excluding that item there could be no recovery under the averments of the petition in excess of $367,225.30, but since in the petition there is a general averment of a total damage of $1,321,457.80 we have given it such liberal construction as is necessary to justify a judgment under this general averment for the amount of our finding as to just compensation.
Somewhat bearing upon this situation it is to be noted that in plaintiff’s requested conclusion of law following its requested findings it proceeds upon the theory of a total claim as stated above, made up of the sum of $495,250.34, which we have found to be just compensation, and the items which we have rejected (Finding NYI) and anticipated profits. Assuming, therefore, that such rejections, heretofore referred to in detail, are justified and that plaintiff is not entitled to anticipated profits our finding as to just compensation fully meets its own requested conclusion from the facts.
If there were doubt in our minds as to the correctness of our conclusions on the question of claimed profits, it would be necessary to consider some other features as to the basis *495 of recovery and to call attention particularly to the fact that the finding as to anticipated profits is based, as requested, upon the difference between the assumed cost of production and the contract price without any allowance necessarily to be made .because of the contingencies and uncertainties of performance as well as results. And since it appears in this case that plaintiff did not perform its contract 949 within the contract period, and was the recipient of a liberal extension of time, and was already, before performance of contract 1498 had begun, soliciting an extension of time as to it, the possible reduction of profits by reason of the application of the liquidated damage clause of the contract would, with the many other contingencies, be for consideration.
If we are right in our conclusion earlier stated as to the proper construction of the act of June 15,1911, and if, therefore, the law read into the contract gave the Government a right to cancel the contract, requiring only just compensation, the compensation required must necessarily have reference to conditions resulting from the exercise of a right and not involving a breach. Having awarded the plaintiff full compensation for all damages accruing up to the time and by reason of the cancellation of the contract is it required that thei’e shall be added thereto the profit anticipated from the performance of the contract upon the same basis as if the cancellation were not a matter of right ?
Considering the existent situation if the right to cancel, as expressed in the statute, had been actually written into the contract, and it was for construction, it is doubtful if such a contention would ever be seriously made. If it should be said that the contract gave the contractor the right to perform the entire contract with resultant profit the answer would be that the contract, necessarily with the consent of the contractor, gave the Government the right to terminate it at any desired stage during its performance, as a result of which any further rights thereunder, with resultant advantage to the contractor by way of profits, ceased. At that point, as by a distinct line of demarcation, the future is separated from the past and adjustment of rights on the *496 basis of ''just compensation to the contractor lias its proper field of operation behind and not beyond that line.
The particular act under discussion does not attempt to define the scope of “ just compensation,” but in one important act we find an expression of the legislative mind as to the basis of compensation under circumstances, some of which are analogous to those with which we are dealing. The Dent Act, 40 Stat. 1272, contemplates adjustment of contracts not formally executed, and it is provided—
“ That in no case shall any award, either by the Secretary of War or the Court of Claims, include prospective or possible profits on any part of the contract beyond the goods and supplies delivered to and accepted by the United States and a reasonable remuneration for expenditures and obligations or liabilities incurred in performing or preparing to perform said contract or order.”
This is, of course, not a Dent Act case, and we are not unmindful of the differences in the status of parties with . or without properly executed contracts, but the purpose of that act was to relieve those complying or having prepared to comply with' Government orders or informal contracts from the disabilities growing out of the fact that they were not then in possession of formally executed contracts and it authorized adjustment with them on a designated basis which to Congress seemed “ fair and equitable.”
It is noted that plaintiff requests reconsideration of our conclusions in the Meyer Scale case and a following in this case of the holding in Gallege Point Boat Corporation, theretofore decided. Counsel was probably not aware of the fact that the conclusions and judgment in the last-named case had been set aside and that the rule of the Meyer Scale case, restated here, is the rule of this court.
Our conclusion, we are confident, awards the plaintiff just compensation upon a basis embodying such elements- of liberality as to preclude any possibility of inadequacy.
Judgment for plaintiff under Finding XIY in the sum of $161,614.58.
Graham, Judge; Hat, Judge; Booth, Judge; and Camt-bebe, Chief Justice, concur.