Madden, Judge,
delivered the opinion of the court:
This suit is brought pursuant to a special act of Congress, the text of which is as follows:
Be it enacted by the Senate and House of Representatives of the United States of America in Congress as-senabled, That jurisdiction is hereby conferred upon the Court or Claims, notwithstanding, the lapse of time or any statute of limitations or any defense because of any awards previously made by the War Department or other authority of the United States or any alleged acceptances thereof by the International Arms and Fuze Company, Incorporated, to hear and determine, upon the basis of just compensation, the claims of the said International Arms and Fuze Company, Incorporated, growing out of contracts numbered G-1048-559-A, dated January 1, 1918, and P-19219-4797-A, dated November 5, 1918, with the United States and the amendments and modifications thereof: Provided, however', That from any decision or judgment rendered in any suit presented under the authority of this Act a writ of certiorari to the Supreme Court of the United States may be applied for by either party thereto, as is provided by law in other cases.
Approved, June 26, 1934.
*352 The plaintiff, during the First World War, entered into a contract, hereinafter called the G contract, to machine 500,000 155-millimeter shell from forgings to be furnished by the Government. The formal contract was dated January 1, 1918, but conversations and correspondence relevant to its meaning took place before and after that date. Several agreements supplemental to the original one were made. The plaintiff manufactured the shell called for by this contract, and was paid the contract price of $11.50 per shell. Although a notice of suspension of the contract was given the plaintiff after the Armistice, that notice was, in effect, withdrawn, and the plaintiff was permitted to complete performance of the contract. Late in 1918, but before the Armistice, when the plaintiff’s performance of the G contract was nearing completion, there were conversations between the plaintiff and officers of the Ordnance Department of the Army looking toward a second contract for the same number of shell. The intervention of the Armistice caused a modification of the plans, but a second contract, hereinafter called the P contract, was signed early in 1919, and was dated November 5, 1918. The defendant claims that this was not a true contract, but an arrangement made by certain subordinate officers in the Ordnance Department for the purpose of enabling the plaintiff to obtain compensation for the cancellation of the supposed contract.
The act of June 15, 1917 (40 Stat. 182), authorized the President to suspend or cancel contracts for war materials and to make “just compensation therefor.” Under that act, if a contractor was not satisfied with the award made to him by the executive officers acting for the President, he could accept 75% of the amount awarded, and sue in this court for the additional sum which he claimed as “just compensation.”
The act of March 2, 1919 (40 Stat. 1272), known as the Dent Act, authorized the Secretary of War to—
adjust, pay, or discharge any agreement, express or implied, upon a fair and reasonable basis that has been entered into, in good faith during the present emergency and prior to November twelfth, nineteen hundred and eighteen * * * for the production, manufacture *353 * * * of materials or supplies * * * or other purposes connected with the prosecution of the war, when such agreement has been performed in whole or in part, or expenditures have been made or obligations incurred upon the faith of the same by any such person, firm, or corporation prior to November twelfth, nineteen hundred and eighteen, and such agreement has not been executed in the manner prescribed by law: * * *
In May 1919 the plaintiff filed with the New York District Claims Board, one of the boards set up after the Armistice by the Chief of Ordnance to settle claims growing out of the suspension of ordnance contracts, its claim on the G contract. It made claim for $2,118,041.38. The District Claims Board made what purported to be a Dent Act award to the plaintiff, which recited that the G contract had not been “executed in the manner prescribed by law,” thus using the language of the Dent Act. The total amount of the award was $1,421,449.81, and the items were: heat-treating expenses, $379,972.50; costs of heat-treating equipment, $93,726.55; annealing hard forgings, $178,906.87; extra cost of machining hard forgings, $480,488.05; expenses caused by delays by acts of the Government, $333,875.72. This award was approved by the Secretary of War.
The plaintiff accepted this award in full satisfaction of its claims under the G contract, and was paid the full amount thereof on February 18,1920.
On March 21, 1919, the plaintiff filed with the New York District Claims Board a Dent Act claim on the P contract, which recited, as was necessary under the Dent Act, that the agreement was entered into in good faith on or about November 5, 1918, and that the plaintiff had made expenditures or incurred obligations on the faith of that agreement prior to November 12, 1918. The Board made an award, approved by the Secretary of War, for $912,614.81, the sum of a list of items named by the Board in its award. This award found the requisite jurisdictional facts as they were recited in the plaintiff’s claim. The plaintiff accepted this award in full satisfaction of its claims under the P contract, and was paid the money on February 26,1920. In 1934, Congress passed the special act recited at the beginning of this opinion.
*354 The plaintiff claims that our function under the special act is merely to determine what the plaintiff’s reasonable and necessary expenditures were in the performance of the two contracts, to subtract from that sum the amounts paid to the plaintiff on the contracts and in the Dent Act awards, and to render judgment for the difference. The defendant urges that even if the plaintiff had, which the defendant denies, lost money on the contracts, the plaintiff can recover nothing as “just compensation” as to the G contract because the contract was performed in full by the plaintiff, it received the contract price, and did not perform any work not called for by the contract. The Government urges, as to the P contract, that it was not a binding contract, and the plaintiff did not perform any part of it, or make any expenditures looking toward performance of it.
The special act, quoted at the beginning of this opinion, gives us jurisdiction “to hear and determine, upon the basis of just compensation the claims of (the plaintiff) growing out of (the G and P contracts).” The Government urges that this act was intended to have the same application as the general act of June 15,1917, which authorized the President to suspend or cancel contracts for war materials and to make “just compensation” therefor. That statute was interpreted by the courts as involving a species of eminent domain. The cancellation, being authorized by the statute, was not a breach of contract by the Government, but was a taking, for the public benefit, of the contractor’s rights under the contract. De Laval Steam Turbine Co. v. United States, 284 U. S. 61, 70, 71; Russell Motor Car Company v. United States, 261 U. S. 514, 528, affirming Russell Motor Car Company v. United States, 57 C. Cls. 464, 488; Meyer Scale & Hardware Company v. United States, 57 C. Cls. 26, 50. The “just compensation” directed by the act of 1917 included so much of the unamortized portion of the investment in plant and machinery which the contractor had reasonably made to enable him to perform the contract as would have been amortized if he had been permitted to complete his performance, and the reasonable cost to him of materials acquired for the performance of the contract. n Barrett Company v. United States, 273 U. S. 227. Just compensation did not *355 include anticipated profits. Brooks-Scanlon Corporation v. United States, 265 U. S. 106, 123, 125; Russell Motor Car Co. v. United States, supra, at p. 523.
The Government urges that, since in fact there was no cancellation of the G contract, the plaintiff having been permitted to complete it and having been paid the contract price, there can be no basis for “just compensation” such as was provided for by the act of 1911. It urges that any excess of expenditures over receipts was the kind of a loss which any contractor risks when he undertakes a specified performance for a fixed price.
Though there is merit in the Government’s argument, it does not persuade us. The problem presented to Congress, when it had under consideration the special jurisdictional act, was that of a contractor which had done a good job of producing important munitions of war when they were badly needed; which had, according to the representations made to Congress, lost money on its contracts; which had been given an allowance by the War Claims Board which one agent of the Board regarded as a sharp bargain on the Board’s part on behalf of the Government. The Senate had passed S. 2809, and when that- bill came to the House, the House War Claims Committee struck out the entire Senate bill and substituted the language of the bill that became the special act. The Committee’s report, in explanation of the substitution, said:
The purpose of the amendment is to substitute the language of the House bill, which has previously been favorably reported by your committee, for that of the Senate bill. The fundamental difference in the two bills is that under the House bill the case would be tried upon the basis of just compensation or an operating-loss basis, while under the Senate bill it would be tried upon the terms of the contracts and extras incident to the contracts. If the Senate bill is enacted, long and costly litigation would follow, and it would be possible for the claimant to secure a judgment for substantial profits. In the opinion of your committee, this would place the Government at an unfair advantage.
Your committee feels that any company which performed such excellent services in time of war as the *356 claimant did is entitled to its day in court in an attempt to recoup its losses, especially when it had the written promise of a branch of the War Department that it could file a final claim and was later denied that opportunity.
For these reasons your committee is of the unanimous opinion the amendment should be adopted and the bill enacted into law.
We think, therefore, that our task is to determine what expenditures were reasonably made by the plaintiff which were fairly attributable to the G and P contracts, and to what extent, if any, those expenditures exceeded the amounts already paid to the plaintiff in connection with those contracts. The questions involved are largely questions of fact. The resolution of these questions is made difficult by several circumstances. (1) The plaintiff had many contracts with the Government for the manufacture of munitions, which contracts were being performed concurrently with the G and P contracts. Whether, or to what extent, the purchase of particular machines or services, or other expenditure of money, was attributable to the G and P contracts or to the others, is often difficult to determine. (2) The last work in performance of these contracts occurred early in 1919. What were supposed to be final settlements of the contracts were made in 1920. The special act reopening them was passed in 1934. The first testimony in this suit was taken in December 1935. After such a lapse of time, testimony as to where certain machines were located in the plant and what they were used for; as to how many out of a large number of pieces of equipment owned by the plaintiff were used for the shell contracts and for how long they were used; and as to many other questions whose answers depended upon - the memory of witnesses, was naturally and necessarily hazy and vague, and fell short of sustaining the plaintiff’s burden of proof. (3) Many of the claimed expenditures, including the largest of those in dispute, were ,not made at arm’s length, but were transfers of the plaintiff’s money to the owners of the plaintiff’s stock, and in many cases in exact proportion to the ownership of the stock, the transfers being directed by the same persons who were to receive the money. As to *357 these claimed expenditures, the normal guaranty of necessity and reasonableness which attaches to an expenditure made at arm’s length, that the self interest of the expender would keep it from being made at all, or from being excessive, is lacking. In the circumstances of this case, the trier of fact is left in doubt as to some of the items of the claim relating to asserted purchases of intangible things, such as insurance contracts and endorsements of company notes, not only as to the reasonableness of the amounts of the claimed expenditures, but as to whether the transfers of funds were expenditures at all, as distinguished from distributions to stockholders. The purchase of machinery by the plaintiff from a wholly owned subsidiary likewise lacks the normal guaranty of a reasonable price which accompanies an arm’s length purchase.
As we have said, the special act had the effect of reopening the whole question of whether the plaintiff has been paid less, and if so, how much less, than it reasonably expended in the performance of the G and P contracts. Thus there is placed upon the plaintiff the burden of justifying each of its thousands of items of expenditure for machines, labor, overhead, etc., which items, the plaintiff claims, add up to a total amount of more than twelve million dollars, some one and a quarter million dollars more than the $10,888,766.89 which, both parties agree, the plaintiff has been paid by the Government. Happily, the area of dispute does not include all of the plaintiff’s claimed expenditures. Only those named in a list of 175 items were in dispute before the testimony was taken. As to the others, the parties agree that the expenditures made, in the amounts claimed, were expenditures properly attributable to the shell transactions. We proceed to the consideration of the list bf disputed items.
MACHINES, OTHER EQUIPMENT, AND LABOR ON PLANT AND EQUIPMENT
In the disputed list are a number of machines and other equipment, and a few items of supplies, and of labor on plant and equipment. As to most of these, the question was whether the items were satisfactorily proved to have been attributable to the shell contracts and our answer represents our view as *358 to that proof. As to a few items, while there was oral evidence which might have been sufficient to connect the item with the shell transactions, the plaintiff’s records, usually invoices, attributed the items, perhaps mistakenly, to one of the plaintiff’s other transactions with the Government. Since these other transactions were in some cases cost-plus contracts and in others were the subject of settlements made by the War Claims Board, we think there is a considerable likelihood that, in view of the plaintiff’s written records, these items were taken into account in those other settlements. If so, it would be improper that compensation should again be made in this case. In view of the likelihood which we have suggested, we think the plaintiff had the burden, but did not sustain it, of showing that it had not already been paid for these items. What we have said relates to items 73, 83, 98, 100, 103, 105, 107, 121, 123-126, 140.
A considerable number of machines and pieces of equipment were, as we have seen, acquired by the plaintiff late in 1917 and in 1918 from its wholly owned Canadian subsidiary. These had been used in the Canadian plant for most of a year. The price which the plaintiff charged itself on its books for these acquisitions was the full price paid by the Canadian Company when the machines were acquired by it, plus thirty-five percent of that price which it had paid as duties and taxes. Here we are troubled, as we have said, by the fact that these acquisitions were not arm’s-length transactions, so that the mere fact that the price was entered on the books is no guaranty of its reasonableness. The Government contends that the full acquisition price, even without the 35% addition, is too much, since the machines had been used for a considerable time. The plaintiff contends that the trend of prices was up; that machines were hard to get in the open market; that second-hand machines were selling for more than the list price of new machines, which in fact could not be bought, except possibly after great delay. The plaintiff’s evidence as to price tendencies was quite general, and did not point to particular machines, though there was variation in the scarcity of machines of different types. On the whole we think, as did our Commissioner, that a fair price to be allowed for the items acquired from the Canadian subsidiary is the *359 full price which the Canadian Company paid, not including the 35% representing duties and taxes. These observations relate to items 5, 9, 10, 14, 17-19, 21, 22, 38-41, 46, 49, 55, 59, and 60.
SALARIES OF HARRISS, PATTERSON, AND HAWKINS
Dr. Harriss and Mr. Patterson, who were president and treasurer of plaintiff, respectively, held equal amounts of the voting stock of the company, and, between them, had complete control of its affairs. The salaries of each of the two offices held by them were set at $100,000 per year. The plaintiff’s claim includes a proportionate part of these salaries as overhead expenses properly attributable to the shell contracts. Reasonable salaries to general executives are proper overhead expenses, and a proper proportion of them is therefore fairly chargeable to the shell contracts. The Government contends that the salaries were unreasonably high, and would have us disallow them entirely on the ground that they were not salaries at all, but were distributions of the plaintiff’s assets to its principal stockholders.
This problem, like the ones relating to insurance and commissions, hereinafter discussed, is confused by the complete absence of arm’s-length bargaining in the fixing of these salaries. These stockholders could as well have set their salaries at twice the amount, or one-fourth the amount, and no one could have effectively concerned himself about them. They were merely paying to themselves, as individuals, what they owned as owners of the plaintiff corporation. But in this suit it is sought to collect these salaries out of the treasury of the United States. This makes the matter the concern of the Government and necessitates inquiry as to the reasonableness of the salaries.
The plaintiff company had only one plant, and only one customer for its product. Production was its most important, and almost its only problem. Harriss and Patterson do not seem to have been about the plant to any considerable extent. They were wealthy men of numerous and varied interests who had their offices in New York City, where they attended to those interests. They did what they were called upon to do for the plaintiff, but what they did was little, in *360 amount and importance, in comparison with what W. J. Hawkins did. He was iiv charge of the plant, and, like Harriss and Patterson, was paid $100,000 a year. The plaintiff urges that Judge Green, who sat as Commissioner during the hearing of a part of the case, discouraged the plaintiff from making fuller proof of the activities of Patterson and Harriss in the plaintiff’s affairs. There is some merit in this contention. We think, however, that the plaintiff’s evidence on this point, the cross-examination of the plaintiff’s witnesses, and the evidence in the case as a whole gives us a reasonably adequate basis for determining the question, and that this question should not be remanded for further trial. We think that the control of this corporation being in Harriss and Patterson, the mere fact that the corporation paid this money to them as salaries raises no presumption of the reasonableness of the amounts. We have concluded that a salary of $20,000 a year each for Harriss and Patterson, to be treated as general overhead of the plaintiff and properly apportioned to the shell contracts, should be allowed as a reimbursable shell expense. The question of the period of time for which these, and other overhead expenses, may be charged, is treated later in this opinion.
SALARY OF W. J. HAWKINS
Plawkins was employed by the plaintiff in 1915, at which time he resigned his commission as a Major in the United States Army, in the Ordnance Department. The 1915 employment contract is quoted in finding 58. It provided for an annual salary of $10,000, payable in monthly installments for five years, and for a cash bonus of $50,000 to be paid to Hawkins upon the signing of the contract. The plaintiff urges that a proportionate part of the cash bonus should be attributed to the period of performance of the shell contract, beginning in 1918, and regarded as a shell expense. We think not. The bonus was paid in 1915 and no strings were attached to its payment which would connect that payment with the plaintiff’s operations in 1918. We have, therefore, not allowed any part of the 1915 bonus as a shell expense.
Hawkins’ 1915 contract provided, as we have seen, for an *361 annual salary of $10,000 a year for five years. Apparently for the purpose of securing the payment of this salary, the plaintiff put $50,000 in escrow, and the monthly payments of salary were to be made and were made out of this escrowed fund. Beginning in December 1911, after the shell contracts had been arranged, the plaintiff raised Hawkins’ salary to $100,000 a year, $10,000 of which was to be paid, as before, out of the escrowed fund, and the other $90,000 from the general funds of the company. The Government’s auditor at the hearing contended that the $10,000 of Hawkins’ annual salary which was secured by the 1915 escrow arrangement should not be included as a shell expense, since the plaintiff had irrevocably committed itself to that expenditure long before it received the shell contract. This contention has no merit, and the Government seems to have abandoned it. Hawkins’ entire salary of $100,000 a year should be treated as general overhead, and a proper proportion of it is reimbursable shell expense.
EIRE INSURANCE AND EMPLOYERS’ LIABILITY INSURANCE
The plaintiff includes among the expenses for which it claims compensation large sums of money paid by it to Har-riss, Patterson, Hawkins, and a Mr. Hoyt for premiums on fire insurance and employers’ liability insurance alleged by the plaintiff to have been written or undertaken by them.
As is shown in finding 59, commercial fire insurance rates on property such as the plaintiff’s were high during the early part of 1917, because of the Black Tom explosion which had occurred in the vicinity. These rates went down in October and November of that year to an amount considerably lower than the rates which plaintiff paid its stockholders. In September 1917, the plaintiff canceled most of its outside policies and, as of September 15, Harriss and Patterson each wrote individual policies for $860,000, and Hoyt wrote one for $400,000, all at the premium rate of $4 per $100 per year, payable monthly, and expiring June 30, 1918. The amounts of these policies were in approximate proportion to the stock-holdings of Harriss, Patterson, and Hoyt and Company, which three held substantially all the stock. Ployt canceled *362 his policy on November 26, 1917, at about which time Hoyt and Company transferred its stock to Harriss and Patterson, an equal number of shares to each. Harriss and Patterson thereupon each increased the amount of his policy by $200,000. On July 1,1918, Harriss and Patterson each wrote a new policy for $3,500,000 for one year at a premium of $4.50 per $100 for the period. On that date Harriss owned 120,000 shares of the plaintiff’s stock, Patterson owned the same number, less 1 share, PI'awkins owned 10,000 shares, and one McCann owned 1 share. The percentages of ownership were thus 48, 48, and 4, except for McCann’s one share. About October 1, 1918, Hawkins wrote a policy for $291,-666.66, dated September 1, 1918, which placed each stockholder’s policy in proportion to his ownership of shares. Premiums were paid monthly, at the rate of $4.50 per an-num per $100. Hawkins was paid the full amount of the annual premium, although two months of the year had passed before its date, and another month had passed before it was actually written. When the policies expired on June 30, 1919, no new policies were written, but payments of premiums were continued through October 17, 1919. The total of such premiums paid to Harriss, Patterson and Hawkins from February 1,1918 to October 17,1919 was $461,260.73, and the plaintiff here asserts that that amount was general overhead and claims $270,729.21 of it as proportionate and compensable expenses of the shell transactions.
Up to July 9,1918, the plaintiff had carried its employers’ liability insurance with outside companies. In June the plaintiff applied to the Department of Banking and Insurance of the State of New Jersey for permission not to carry such insurance with outside companies, and to pay compen-sátion without such insurance. It also asked for information as to whether 2 or 3 stockholders could reinsure the liability thus undertaken by the plaintiff. On July 3 the Department granted the plaintiff an exemption permitting it to pay compensation without carrying insurance. The plaintiff was advised that the Department had nothing to do with the matter of reinsurance. Thereupon the plaintiff began to pay Harriss, Patterson, and Hawkins employers’ liability insurance premiums, at regular commercial rates, in proportion *363 to their ownership of the plaintiff’s stock. The amount so paid from July 9 to December 1,1918, was $114,128.29. Compensation paid to employees during that period was about $7,000. These payments were charged back to the three stockholders, in proportion to their holdings. But payments of $24,594.19 made by the plaintiff to employees in 1919, for injuries sustained during 1918 while these premiums were being paid to the stockholders, were not charged back to the stockholders on the plaintiff’s books, nor otherwise collected from them. The plaintiff here contends that after making allowance for that failure, $32,600.51 of the amount thus paid to Harriss, Patterson, and Hawkins was a proper direct expense of the performance of the shell contract, and $16,000.15 more of it was a fair proportion of the general overhead expense of that performance. The plaintiff has not proved that any contract of employers’ liability insurance or reinsurance was ever written or issued by Harriss, Patterson, or Hawkins.
We think that none of these so-called insurance premiums were expenses of the performance of the shell contract which are compensable in a proceeding such as this. The transactions relating to them, taken as a whole, show that the dominant stockholders of the plaintiff concluded not to pay outside insurance companies for relieving them of the risks of fire and employers’ liability, but to bear that risk themselves, and divide the money saved thereby among themselves in proportion to their ownership of the business. On this basis, it made no difference to them that the rates were much higher, as they were in the case of the fire insurance, than the rates at which outside companies would have written the insurance, or that the amount of coverage was higher, as it seems to have been, than the property insured would have justified. When, in June 1918, the policies carrying the already too high rate of $4.00 per hundred per year expired, Harriss and Patterson increased the amount of the coverage by nearly $5,000,000, though no such addition to the value of the property insured was made at that time, and increased the rate to $4.50. In September 1918, it apparently occurred to them that Hawkins, who held one twenty-fifth of the stock of the company, was not sharing equitably in its distributions, *364 so they permitted him, on about October 1, to write a policy dated September 1, with a coverage in exact proportion to his stock ownership, and they paid him the whole year’s premiums from July 1, though three months had passed without loss before his policy was written. As an equitable distribution among the owners of the business, this transaction is understandable. As an arm’s-length purchase of insurance protection by the plaintiff, it is not.
When the fire insurance policies of 1918 expired on June 30, 1919, the plaintiff continued to pay Harriss, Patterson, and Hawkins the same monthly sums which they had been receiving on the insurance account, though the policies were not renewed, and though commercial policies, prudently purchased at that time would have been at the reduced rate applicable to an idle plant with watchmen, and for a reduced coverage, since much material had been removed from the plant. These circumstances fit the pattern of a distribution among stockholders, not that of a true shift of the risk of loss from the owner of the business to an outsider, for a prudent price.
We regard the so-called employers’ liability insurance for which Harriss, Patterson, and Hawkins were paid, and for which payments the plaintiff seeks compensation, in the same light. Here, so far as the proof shows, no policies were even written. The payments which were made to employees after January 1,1918, for injuries which occurred during the time that these stockholders were supposed to have been insurers were paid by the plaintiff and were not collected from the supposed insurers. These circumstances, like those relating to the fire insurance, are consistent with a proportionate distribution among stockholders, but are not consistent with a normal purchase of insurance. We think therefore, that the payments are not compensable.
COMMISSIONS PAID BY THE PLAINTIFF TO HARRISS AND PATTERSON FOR INDORSING THE PLAINTIFF’S NOTES
The G contract for shell was dated January 1, 1918. On January 3, 1918, the plaintiff and the Government entered into an agreement supplementary to the G contract, by which the Government agreed to advance $1,000,000 to the plaintiff, *365 to be Repaid by specified deductions from tlie sums which would otherwise have been payable to the plaintiff upon the completion and delivery of installments of shell under the contract. The plaintiff agreed to give the Government its promissory note for $1,000,000, bearing 5% interest, and indorsed by Patterson and Harriss. The note was executed as agreed, and the plaintiff paid Patterson and Harriss $50,000 each, as commissions of 5% each for their indorse-ments. Another supplemental agreement, made March 21, 1918, provided for the loan by the Government to the plaintiff of $725,000 upon the plaintiff’s promissory note, bearing 7 % interest, and indorsed by Patterson and Harriss. Upon the execution of this note, the plaintiff gave its notes to Patterson and Harriss for $36,250 each, as commissions of 5% each for their indorsements. When these latter notes were paid, one twenty-fifth of the combined amounts of them was paid to Hawkins, instead of to Patterson and Harriss. Thus each of the three stockholders received, as to the latter note, a payment in exact proportion to his holdings of stock in the company.
The plaintiff includes in its claim for compensation the $172,500 thus paid by it to the three stockholders. The Government contends that these payments were distributions, and not true expenditures made in order to perform the shell contract. The plaintiff produced several bankers as witnesses who testified that the charge of 5% commission by each of the two indorsers was reasonable. One testified that he would have charged 25% for his indorsement; another that he would not have done it for 15%; another that he would not have done it for 10%, but might have for 15%.
Patterson and Harriss, the indorsers, were, in effect, the owners of the business which borrowed the money. The loan agreement, which was thus their agreement, was that the money should be used for the manufacture of the shell called for by the contract. As rapidly as it was so used, a part of the price of the shell was to be credited on the loan, and their liability as indorsers thus reduced. Except for casualties such as fire, against which they could have insured with outside companies, and against which they *366 themselves purported to insure, at a high rate of premium, as fast as the borrowed money was put into the work on shell, the loan was paid and the indorsers’ liability correspondingly reduced. The indorsers could hardly ask, as individuals, to be paid a premium for the risk that they, as owners and managers of the corporate business, would use the borrowed money for purposes not authorized by the loan, and thus make the loan unsafe.
We think that the facts relating to the ownership and control of the business being what they were, the indorse-ments of Patterson and Harriss to secure the repayment of the advances of money by the Government to the plaintiff, to be paid out of the agreed price of the finishing of the shell, did not subject the indorsers to-risks substantially different from those undertaken by a commercial bonding company which guarantees the performance, by a contractor, of his contract to furnish supplies, such as ammunition, to the Government. The commercial rate for such a bond ranges from one-tenth to one-fifth of one percent, for a liability for a period of two years.
The question is, then, not what risks banker B would regard as involved in guaranteeing the repayment of some two million dollars borrowed by A from C. It is, in effect, what risks A himself thinks are involved, if he uses the borrowed money to produce goods already contracted to be sold to C at a price which A had himself bid. When the Government agreed to advance this money to the plaintiff, supposing that it needed it in order to finance the shell operation, it could not have contemplated that one-tenth of it would be immediately diverted from the manufacture of shell into the pockets of those who, as the owners and managers of the plaintiff company, had borrowed the money to further the performance of the contract.
If Patterson and Harriss had themselves regarded these so-called commissions as compensations for risks incurred by them, there is no reason why they should have divided them with Hawkins, as they did the second commission, in proportion to. his ownership of stock. That conduct is consistent with a purpose to fairly distribute dividends, *367 but is wholly inconsistent with the idea of compensation for risks undertaken. This, in connection with the other circumstances, persuades us that these payments were not intended to be, and were not in fact, commissions, but were distributions of the plaintiff’s assets among its stockholders. Patterson, in a legal action relating to his income tax for this period, took the position that these payments and also the insurance premiums, were distributions of dividends and not compensation for the endorsement of the notes. He urged that they were liquidating dividends, and hence not taxable as income. The court in the tax case held they were not liquidating dividends, which we suppose was right, since the plaintiff company was not in liquidation at that time, but in full operation.
POWER, HEAT, AND LIGHT
In keeping its own accounts, the plaintiff apportioned the costs of power, heat, and light purchased by it to the several contracts as overhead, in proportion to the plaintiff’s direct labor costs for each of the contracts. In this suit it seeks to increase the charge to shell by the amount $28,370.16 beyond the charge thus made in its own accounts. It asserts that the shell operations were heavier consumers of power per unit of labor than those under its other contracts and that its book account allotment of overhead to shell was therefore too small. We think there may have been some under-allotment of power costs to shell. But the computation which the plaintiff now asks us to accept in place of its former one is not a correct one. It proposes to subtract from the amount of power bought each month after the shell operations started in February 1918, the average amount used in each of the five preceding months, and charge the rest to shell. However, the nonshell work increased, both as to the amount of labor and the number of machines used in it, during the period of the shell operations. All of this increase would, if we adopted the plaintiff’s proposed method, be charged to shell. Furthermore, it seems probable that in previous settlements of other contracts the plaintiff’s account book method of attributing these costs to the several contracts *368 was used. If it was, there would be overlapping and double payment if the former method were abandoned in this case. The plaintiff’s claim is disallowed in the amount of $28,370.16.
COAL INVENTORY ADJUSTMENT
The plaintiff had on hand in May 1919, 7,450 tons of coal which had cost it, including freight, $50,660.00. The price of coal had gone down so that its value was only $32,631.00. The plaintiff had thus lost $18,029. It includes in its claim $11,643.09 as the proper proportion of this loss attributable to the shell contracts.
Similar claims for this loss on coal were asserted by the plaintiff in the settlement of five of its other munitions contracts with the Government, and the Government paid the plaintiff a total amount of $15,234.51, on account of this loss, in those settlements. The Government should receive credit for that amount, of course.
When the plaintiff received the coal from time to time in 1918, it charged the freight which it paid on it to factory operating overhead. This method of accounting meant that the freight cost was apportioned among the different contracts, and their proper proportion has been paid for in the settlement of those finally settled. A proper proportion of this freight cost is, likewise, included among the legitimate expenses of the shell contracts here in suit. Thus the plaintiff has been or will be paid the $15,234.51 discussed above, and $16,613.50, the cost of the freight, or a total of $31,848.01. Since the plaintiff’s total loss was only $18,029, it has already been or will be overpaid, and its claim of $11,643.09 on account of this loss must be disallowed. In addition, the further overpayment which would result from the full allowance of freight as general overhead in this case must be proportionately eliminated by an additional disallowance of $9,246.57, making a total disallowance of $20,889.66. This will still leave the plaintiff considerably overpaid, so far as this coal transaction is concerned, when all of the contracts are considered together.
PREMIUM EOR INSURANCE ON THE LIFE OF W. J. HAWKINS
The plaintiff on June 26, 1918 insured the life of W. J. Hawkins for $1,000,000, $250,000 of which was to be assigned *369 to Hawkins’ family in tbe event of his death. The premium paid by the plaintiff was $33,200.75, and $14,929.79 was allocated to the shell contracts as a proper proportion of a general overhead expenditure. This insurance was, so far as the $750,000 which the plaintiff would have received upon Hawkins’ death, a prudent investment, in view of the plaintiff’s dependence upon Hawkins’ management. As to the part which was for the benefit of Hawkins’ family, it was an addition to his compensation, and reimbursable as such. While the period of one year for which the premium was paid extended considerably beyond the period for which the shell contracts were properly chargeable with general overhead, it is likely that the policy at short rate premiums would have cost almost as much, if terminated on January 31,1919. We have therefore allowed the $14,929.79. We have disallowed the premium for the renewal of the policy in 1919, because the overhead expenses of the plaintiff at the time of the renewal were no longer properly chargeable to the shell contracts.
INTEREST
The parties are in dispute as to the amount of interest which should be allowed the plaintiff as a shell charge. The Government, by agreements supplemental to the G contract, advanced $1,000,000 to the plaintiff at 5% interest on January 3, 1918, and $725,000 at 7% interest on March 21, 1918, the loans to be repaid by deductions from the contract price for completed shell, at a stated rate of deduction. The plaintiff repaid the loans, and paid the agreed interest in the amount of $85,184.85. It now includes that amount in its claim as a compensable shell expense. The Government contends that the plaintiff did not begin to use the $1,000,000 for shell purposes at the time it received it, but used it to pay off existing debts, and for various other purposes not connected with shell. We think that to whatever extent and for whatever time this and the later advance of $725,000 were used for purposes other than shell, the interest paid by the plaintiff to the Government for the money was not a shell expense. The second disagreement relative to interest is based on the fact that the plaintiff in its claim has computed all interest paid to the Government at six percent. The defendant com *370 putes it at 5% until the $1,000,000 advanced by the Government at 5% was used up, then at 7% until the additional $725,000 advanced at 7% was used up, and then at 6%. The defendant’s method is the more accurate and should be used if a recomputation were to be made.
Another question relative to interest was necessarily left unsettled until after this stage of the case had been passed. The plaintiff has computed interest upon disbursements made on account of the shell transactions to the extent that those disbursements were in excess of receipts on the shell account. The computations were made for monthly periods. The question of the proper amount of principal upon which interest should be computed was necessarily contingent upon what expenditures we would hold to be properly chargeable to the shell transactions. The determination of the correct amount of allowable interest has not, therefore, been made, and, because, as stated in finding 65, it would not affect the result, the recomputation need not be made.
POST SUSPENSION EXPENSES
Plaintiff seeks to recover, as expenses “growing out of” its shell contracts within the meaning of the special act, its expenditures for two periods, April 1, 1919, to October 31, 1919, and November 1, 1919, to February 1, 1920. The plaintiff uses these dates because, it says, by April 1, 1919, all manufacturing operations upon shell had ceased; by November 1, 1919, the Government had removed the last of its property from the plaintiff’s plant, and by February 1, 1920, the awards made to the plaintiff by the War Contracts Settlement Board had been paid. - The Government contends that the manufacturing operations had ceased by February 7, 1919, and that that date, rather than April 1, is significant. The plaintiff, listing all of its expenses for the periods named, tabulates those expenses in two separate lists.
In one list it attributes some 65% of the expenses to the shell contracts as a proper proportion of the plaintiff’s general overhead, the proportion being based upon the ratio of direct labor on shell during the last 3 months of 1918, to direct labor on the plaintiff’s other contracts during the *371 same period. The Government properly objects to the proportion, since the overhead, if allowable at all, would be allowable as a sort of winding-up expense during a period when no direct labor was being performed on any of the contracts, and the selected period, the last three months of 1918, was the period when shell production was at its highest, and accounted for a much higher proportion of direct labor than it had, on the average, for the full year period of shell production.
In the second list, the plaintiff includes the rest of its expenditures for the two periods named above, which con-cededly had no relation to the shell contracts, either directly or as apportioned overhead. It calls these items “unabsorbed overhead” and seeks to justify their inclusion in this suit by pointing to a letter written March 4, 1919, by the New York District Claims Board, and referred to in finding 64, as well as later in this opinion. We consider “unabsorbed overhead” later herein. We now take up the first part of the plaintiff’s claim.
(A) GENERAL OVERHEAD APPORTIONED TO SHELL
All manufacturing work on shell was completed by February 7, 1919. The plaintiff had been aware long before that time that the Government was winding up its munitions work. Some of the Government’s machines and other property remained in the plaintiff’s buildings until November 1, 1919. The plaintiff made an agreement with the Government as to the fair price of this storage, $13,750.92, of which $2,859.32 was on account of shell materials, the balance being for materials related to other contracts. Apart from this storage, the plaintiff’s only business with the Government after that time was to prepare and present its claims, under the applicable statutes, on its several contracts with the Government. Yet the plaintiff now includes in this portion of its claim all of its expenses, not only for the period while the storage continued, but for three months thereafter, except such of its expenditures for the same periods as it had already included in its claim under another category. These other expenses were the salaries of its executive officers, its payments to its stockholders on *372 account of insurance, and other items. The plaintiff’s accountant attributed these payments to the period before April 1, 1918, the so-called productive period, though they were made thereafter, because of what he described as “legal commitments * * * made during the productive period.” There is however no evidence of such legal commitments. We conclude, therefore, that the period during which general overhead expenses of the plaintiff were properly chargeable to shell ended February 1, 1919. While there were some slight manufacturing activities during a few days following that date, that fact is balanced by the fact that during the days before that date, the shell activities were slight, and did not justify the portion of the overhead attributed to them. The amounts claimed by the plaintiff as post suspension general overhead apportioned to shell are disallowed.
(B) TJNABSORBED OVERHEAD
The plaintiff has also included in its claim those portions of post-suspension overhead which were, on the basis of apportioning 'overhead among its several contracts with the Government on a proportionate basis, chargeable to contracts other than shell. Many of the items in this part of the plaintiff’s claim would on any normal basis of accounting, have been completely attributable to contracts other than shell, and would have had no relation whatever to the shell transactions, even on a proportionate overhead basis. The plaintiff justifies its introduction of these items into this claim by pointing to a letter written to it by the New York District Claims Board on March 4, 1919. That letter recites that in settling the plaintiff’s claims upon several of its contracts theretofore settled, “an estimate was agreed upon as to the cost of unabsorbed overhead incurred by you during the time of suspension on each of your contracts and the final closing down of all work in connection with such contracts” and that the Board and the plaintiff had agreed “to divide the estimated cost of unabsorbed overhead pro rata among the different contracts held by your company.” The letter then purports to give to the plaintiff the privilege of submitting, in connection with its “final claim” a statement of the exact cost of *373 unabsorbed overhead which, if it proved to be greater than the agreed estimated amount, would be an item to be considered in the “final claim.” This letter also purported to give the plaintiff the privilege of re-presenting in its final claim “certain items which have been rejected from previous claims.”
The plaintiff urges that the shell claim was the final claim and that therefore, under the authority of the letter from the District Claims Board, it may include these claims though they are unrelated to shell, among its claims in this suit.
The letter from the Board related, of course, to claims filed before the Board. Whether one or the other of the shell claims filed with the Board was the last claim filed, has not been proved. One of plaintiff’s counsel stated[3] before the House Committee which in 1933 was considering H. ft. 12981, a bill substantially identical with the special act under which this suit is brought, that the claims before the Board relating to the two shell contracts were not the last claims, since if they had been “it would have been the duty of the company to include the unabsorbed overhead and other items in such claim because it would have been the ‘final claim’ to which Colonel Adam’s letter refers.” It may be inferred from this statement that these items of “unabsorbed overhead,” here presented, were not in either of the shell claims when they were adjudicated by the Board. Neither were they, apparently, in whatever claim was the “final claim.”
Whatever we might think of the merits of these items of “unabsorbed overhead,” we have no jurisdiction to adjudicate them. The special act gives us jurisdiction to hear and determine the claims of the plaintiff “growing out of contracts numbered * * * (the shell contracts) * * * and the amendments and modifications thereof.” These items of unabsorbed overhead did not grow out of the shell contracts. They had no relation to these contracts. The letter from the District Claims Board purported to say only that such items could be physically included in and considered at the same time with the final claim which the plaintiff would file with the Board. Even if they had been so physically included, that would not have made them claims “growing out of the *374 shell contracts” within any ordinary meaning of that language. Special acts are to be strictly construed. Only by going to the opposite extreme from that canon of construction could we bring these items within our jurisdiction. They will, accordingly, be disallowed.
THE DEFENDANT’S COUNTERCLAIM
The Government pleaded, in addition to its denial of any right in the plaintiff, a counterclaim asking for the refund by the plaintiff, with interest, of the amounts of the awards paid to the plaintiff in 1920 in the Claims Board settlements of the G and P contracts. The amounts of these payments were $1,427,449.81 on the G contract, and $912,614.81 on the P contract. It urges that these awards were made and paid under “mistakes of fact and law induced by plaintiff’s fraud.”
The plaintiff in this suit is, of course, crediting the Government with the amounts paid it under those settlements: If the counterclaim were sustained, that credit would be canceled and the amount appearing on the plaintiff’s side of the accounting in the principal suit would, we suppose, be correspondingly increased. That would result in plaintiff’s receiving a judgment in the principal case for substantially the principal amount which would be taken from the plaintiff on the counterclaim, i. e., the amount of the payments made to the plaintiff in the 1920 settlements. We say “substantially the amount” since it will be remembered that we have found that the plaintiff’s shell expenses and the amounts paid to the plaintiff on the shell contracts were substantially equal, the latter being in excess of the former by a small ascertained amount, which amount would be somewhat increased if final computation of the interest involved in item 172 were made. The net result, then, of sustaining the counterclaim would be that the Government would recover on its counterclaim, so far as the principal of the sums paid the plaintiff in the 1920 settlements is concerned, that relatively small difference.
But the Government, as we have said, demands interest upon the amounts paid to the plaintiff in 1920. The interest would be a large sum, and would require a large judgment in favor of the Government, unless, in turn, the interest paid on the counterclaim should be regarded as a shell expense, *375 thus canceling itself. We suppose that it would not be a shell expense, within the scope of this suit.
The plaintiff urges that, regardless of the merits of the counterclaim, a judgment upon it should not include interest, since the Government, if it now has a right to recover the 1920 payment, could have sued upon that right at any time since 1920, and its laches in not so suing should at least prevent it from recovering interest. It also says that no interest is recoverable until a demand for payment has been made, and that no demand was made by the Government for the return of the awards until its counterclaim was filed in 1940.
These are interesting, as well as difficult, questions. We do not reach them, however, because we have concluded that the defendant has not sustained its counterclaim on the merits.
ERATO»
We do not think the plaintiff made fraudulent representations in its claims filed with the District Claims Board. As to the P contract, the plaintiff had, at the time of the negotiation of the G contract, late in 1917, desired a contract for 1,000,000 shell, rather than 500,000, the number provided in the G contract. It had been told that if it produced the 500,000 shell satisfactorily other contracts would be forthcoming. As shown in findings 36 to 45, direct negotiations for a second contract began in August 1918, and by the end of September the Ordnance Department had decided to give the plaintiff an additional contract and purchase a part of its machinery. On October 14, the Department wrote the plaintiff giving the details of a contract which had been orally negotiated before that date. That letter was not written by an officer who was legally authorized to make final contracts, and it so stated, but it would, normally, have been followed by a formal contract, but for the intervention of the Armistice. Because of that fact, the Department felt obligated, after the Armistice, to give the plaintiff a formal contract, dated November 5, in order that the plaintiff might have the same remedies as if the formal contract had been made at that date.
In these circumstances, it was not fraudulent for the *376 .'.plaintiff to assert a claim under the Dent Act, the District •Ordnance Claims Board of New York having sent forms and instructions for filing claims to the plaintiff both before and after the date of the enactment of the Dent Act, March 2, 1919. The statements in the plaintiff’s claim on the P contract, that “the claimant had performed the agreement in whole or in part, or had made expenditures or incurred obligations upon the faith thereof, prior to November 12, 1918,” had little in the way of facts to support them, but the Ordnance Department’s officials, when they armed the plaintiff with a formal contract for the purpose of enabling it to make a claim, knew the facts as well as the plaintiff did. They apparently regarded the two shell transactions as being closely related, as in fact they were, in the sense that both parties had contemplated, from the beginning, that the plaintiff would machine additional shell beyond those called for in the first contract.
As to the G contract, the Government served a suspension notice after the Armistice. The plaintiff would have had a right to file a claim under the act of 1917 on account of that suspension. The fact that the Department made an award under the Dent Act, as for an imperfectly executed contract, rather than for a suspended contract, does not reflect on the plaintiff’s good faith in filing its claim. The whole matter of heat treatment was greatly confused, in the parties’ dealings, and the plaintiff had reason to feel that it had a presentable claim for additional compensation on that account. The same was true with regard to the condition of the forgings as to hardness and lack of specified shape. In these circumstances we think that the Claims Board and the War Department, being fully aware of the facts, did not act under any misapprehension or mistake of law so serious as to make their awards recoverable on the Government’s counterclaim.
The plaintiff is not entitled to judgment on its claim, nor the defendant on its counterclaim.
It is so ordered.
Littleton, Judge; and Whaley, Chief Justice, concur.
Jones, Judge; and Whitaker, Judge, took no part in the decision of this case.

 Hearings, pp. 10, 11.